**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **AMERICAN CIVIL LIBERTIES** ) | |
| **UNION OF OHIO FOUNDATION, INC.,** ) | |
| **STEPHEN McNULTY,** ) | |
| **ROBIN GOIST,** ) | |
| **KHALIL WEATHERS,** ) | |
| **JASON RODNEY,** ) | |
| ) | |
|        Plaintiffs, ) | |
| v. ) | Civil Action No.: |
| ) | |
| **CITY OF CLEVELAND,** ) | |
| **MAYOR FRANK G. JACKSON,** ) | |
| in his official capacity, ) | |
| **CHIEF OF POLICE CALVIN D.** ) | |
| **WILLIAMS,** in his official capacity, ) | |
| ) | |
|        Defendants. ) | |
| ) | |

## **COMPLAINT**

1.     Plaintiffs invoke this Court's jurisdiction to protect their rights to protest against Defendants without fear of retaliatory arrests and unnecessarily long custodial detentions.

2.     Defendants have a policy – which has been both announced and demonstrated – of using arrests and custodial detentions in order to deter and incapacitate protesters.

3.      Defendants' policy violates the First Amendment's guarantee of the rights to speech

and peaceful assembly, and the Fourth Amendment's prohibition on unreasonable

seizures.

4.      On May 23, 2015, the individual plaintiffs and dozens of other protesters and

observers were lawfully and peacefully assembled in response to the acquittal of

Cleveland Police Officer Michael Brelo.

5.      Without any probable cause or reasonable suspicion to believe that the protests were

unlawful, the Defendants herded the protesters and observers to a small alleyway,

blocking the exits with armed officers to prevent movement.

6.      Minutes later, the Defendants began to arrest the protesters and observers, ostensibly

for failing to comply with an order to disperse which no one heard and which was

made impossible by the officers' own actions in preventing exit.

7.      All the protesters were then held in custody for this low-level misdemeanor for nearly

36 hours because, in the City's Deputy Chief of Police's own words, the Defendants

did not want to "let [the protesters] back out on the streets to protest again."

8.      Plaintiffs ask the Court to remedy their constitutional rights and stop Defendants'

effort to silence protests against the Defendants.

9.      Unless restrained by the Court, Defendants will continue to engage in the

unconstitutional and illegal conduct alleged below, causing irreparable harm to the

Plaintiffs and the people of Cleveland.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this matter pursuant to Article III of the Constitution of the United States and 28 U.S.C. §§ 1331 and 1343(3) and (4).  The relief sought is authorized by the Constitution of the United States, 42 U.S.C. § 1983, and other law.

11. This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2).  The actions giving rise to this suit took place in this judicial district. Defendant City of Cleveland is located within this judicial district, and Defendants Mayor Jackson and Chief of Police Williams, sued in their official capacity, work in this judicial district as well.

## PARTIES

**Plaintiffs**

12. **The American Civil Liberties Union of Ohio Foundation, Inc.** ("ACLU of Ohio") is an Ohio not-for-profit corporation with a principal place of business at 4506 Chester Ave, Cleveland, Ohio.  The ACLU of Ohio's mission is to aid in maintaining and extending constitutional and other fundamental rights, liberties, privileges, and immunities, and to take all legitimate action in furtherance of that objective without political partisanship.  The ACLU of Ohio has approximately 30,000 members and supporters statewide.  Its members include a number of passionate activists who support its mission, celebrate and exercise the right to speak out, and protest practices that they find objectionable.

13. **Stephen McNulty** ("McNulty") is a first year medical student at the Ohio University College of Osteopathic Medicine in Athens, Ohio.  At the time of the events covered

3

by this complaint, McNulty was employed as a patient care nursing assistant at the Heart and Lung Transplant Unit of the Cleveland Clinic.

14. McNulty has a passion for photography and documenting dramatic, emotionally laden human events.  Prior to working at the Cleveland Clinic, McNulty travelled internationally as a professional photographer.  While spending time in New Zealand, McNulty photographed and documented the aftermath of an earthquake that destroyed the town in which he was residing. McNulty also attempted to photograph and document the devastation wrought by the catastrophic Japanese tsunami and nuclear disaster in 2011, but he was unable to do so after complying with the order to evacuate.  McNulty's photographs have been used by both iCNN and NPR.

15. **Robin Goist** ("Goist") attends college at John Carroll University ("JCU") in Cleveland, pursuing a degree in Journalism, with minors in Women and Gender Studies, as well as Political Science.  Her permanent address is in Youngstown, Ohio. While attending JCU, she has grown to love the City of Cleveland and cares deeply about issues affecting it.

16. Goist has a passion for social justice. She attended her first protest in fifth grade – a demonstration against the Iraq War in Washington, D.C. Since then she has attended approximately 25-30 other demonstrations.  Goist's engagement with social justice issues earned her a scholarship at JCU.

17. **Khalil Weathers** ("Weathers") is a Cleveland native who resides in the City of Cleveland.  Weathers graduated from Nexus Academy in Cleveland and currently works at Circle K as a sales associate and cashier.

18.     Weathers also cares deeply about social justice; he has volunteered with a group called Golden Ciphers since 2010. The group performs community outreach, focusing on Cleveland youth.

19.     **Jason Rodney** ("Rodney"), a Cleveland native, graduated from Cleveland Heights High School, in Cleveland Heights, and then Macalester College, in Saint Paul, Minnesota. After graduation, Rodney worked as an art therapist in the St. Paul school system.  Recently, Rodney began working for a nonprofit organization – Clean Water Action – focusing on environmental issues and sustainability.

20.     Rodney cares deeply about social justice and has taken part in many protests on issues including labor rights, trans rights, immigrants' rights, and against police violence.

**Defendants**

21.     **Defendant City of Cleveland** (the "City") is a municipal corporation located in Cuyahoga County, Ohio.

22.     **Defendant Frank G. Jackson** is the Mayor of the City of Cleveland, Ohio. He has served in this position since January 2, 2006. As Mayor, Jackson is the executive head of the City of Cleveland.

23.     **Defendant Calvin D. Williams** is the Chief of Police of Cleveland, Ohio.  He has held this position since February 10, 2014. As the Chief of Police, Williams serves at the pleasure of the Mayor and is the head of the Cleveland Division of Police.

## FACTS

**The Brelo Verdict**

24.     On the morning of May 23, 2015, the verdict in the trial of Michael Brelo, the Cleveland police officer charged with two counts of voluntary manslaughter for the

5

deaths of Timothy Russell and Malissa Williams was announced.  Brelo was found not guilty.

25. The City of Cleveland and the Cleveland Division of Police anticipated that the announcement of the verdict was likely to trigger protests.  In anticipation of possible mass arrests, the City communicated with the Cleveland Municipal Court to ensure that judges would be on call and available as needed to process all arrestees without delay.

26. Protests did, in fact, follow the announcement of the verdict. As the day of May 23 wore on, protesters became more numerous. By evening, well over 100 protesters had gathered in downtown Cleveland, marching together in the streets.

**Stephen McNulty -  May 23-24**

27. McNulty was dining with friends on a restaurant patio on East 4th Street in downtown Cleveland.  Around 8:30 p.m., he noticed protesters and police officers marching north on East 4th Street towards Euclid Avenue.

28. When McNulty and his friends finished their meal, they decided to follow the protesters, who were moving east on Euclid Avenue towards East 9th Street.  The protesters were marching peacefully, obeying police orders.  There were approximately 100 police officers, suited and equipped with riot gear, marching as well.  McNulty took some photos with his camera phone.

29. Wishing that he had an actual camera with him to document the event, McNulty decided to return home, which at that time was nearby at 1701 East 12th Street, to retrieve his good camera.  When he returned with camera to East 9th Street, McNulty realized that the protesters had moved on to a different part of the city.

30.     Following the sights and sounds of police cars, McNulty caught up with the protesters on West 6th Street, as they were being herded by police into Johnson Court, a small alleyway that extends for the one block between West 6th and West 9th Streets. McNulty followed the protesters into Johnson Court in order to continue documenting the events.  The protesters were chanting and otherwise expressing themselves in a lawful manner.

31.     After McNulty entered Johnson Court, a horde of police officers moved in and created lines of their riot-gear clad bodies to form blockades closing off both ends of the alley, trapping McNulty and the rest of the protesters and observers inside.  The scene was captured by video. *See* Video Clip 1, attached as Exhibit 1; Video Clip 2, attached as Exhibit 2, Sergeant Report, pg. 2, attached as Exhibit 3.

32.     Several individuals pleaded with the officers, asking, "Where are we supposed to go?" and, "What do we do?" *See* Video Clip  2, attached as Exhibit 2

33.     The only opening from the alleyway was a temporary small gap in the line of officers who were blocking the west end of the alley. McNulty overheard that officers had opened the gap so that protesters could leave. Accordingly, some protesters formed a line so that they could exit the alley. To their surprise, however, these protesters were arrested.

34.     Nearly all of the protestors and onlookers inside Johnson Court – approximately 70 individuals – were then arrested, including McNulty. They were later informed that their arrest was for "failure to disperse," a misdemeanor.

35.     McNulty did not hear an order to disperse, nor could he have dispersed if such an order was given since any available exit was blocked by lines of police officers.

McNulty's later conversations with numerous other arrestees revealed that no others had heard such an order either.

36.     McNulty informed the officers that he was simply photographing the events, but he was told that he needed a permit if he wished to photograph.  McNulty was not given a reason at that time for his arrest.  He was handcuffed tightly using plastic handcuffs. Though the handcuffs caused pain, McNulty did not complain since he witnessed an elderly women's handcuffs further tightened by police officers when she pleaded that they were too tight.

37.     McNulty and the other arrestees were then taken to Burke Lakefront Airport around 11:00 p.m., where arrestees were made to sit on the concrete floor of an empty hangar. Conditions were wretched: there were rat feces on the filthy floor. Requests for water fell upon deaf ears.

38.     At approximately 1:00 a.m., McNulty was transported from the hangar to the city jail on West 3rd Street. Although the cells were designed for one inmate, two were placed in each cell. Thin, dirty mats were distributed to serve as beds.

39.     After 12 hours in the city jail, McNulty was transferred to the County Workhouse, around 1:00 p.m., now May 24, 2015. At this facility, the only drinking water available was contaminated by a broken sewer line and was murky and discolored.

40.     About 24 hours after his arrest, McNulty was informed that he and the others were being charged with "obstructing traffic" and "failure to disperse."

41.     McNulty talked with the other arrestees.  None of them had heard any police order to disperse. Even if such an order had been given, and even if it had been heard – which

it was not – police officers had made compliance impossible by trapping the protesters inside the alley.

42. McNulty heard the guards state that protesters were not yet being released to prevent any disruption of a Cleveland Indians' game taking place that evening.

43. A formal charge of "failure to disperse" was filed against McNulty on the night of Sunday May 24, 2015. McNulty's father had been waiting at the courthouse for charges to be filed so that he could bail his son out of jail, which he did immediately after charges were filed. Nearly 60 other protestors were held for another night until Monday, May 25, 2015 before they were freed following a hearing.

44. Several weeks later, on June 16, 2015, the City of Cleveland dismissed the charges against McNulty.

45. Assistant Prosecutor Karyn Lynn, after reviewing a video of the event, stated that McNulty was "taking photographs" and "was [not] acting disorderly." *See* Transcript of June 16, 2015 Pretrial Hearing held in *City of Cleveland v. Stephen McNulty*, Cleveland Municipal Court, Case No. 2015 CRB 010507, attached as Exhibit 4.

46. Despite McNulty's passion for documenting important human events, after his ordeal with the Cleveland Police Department May 23-May 24, 2015, he is now extremely reluctant to attend any future protest in Cleveland. He fears he could once again be corralled by police, with no way to avoid getting arrested, through no fault on his part. He would fear being held in jail again for so long, and would also worry that an arrest could mar his record, affecting his career as an upstanding physician.

**Robin Goist - May 23-25**

47.     Goist learned of the verdict while home in Youngstown, Ohio, where she resides
        when not in school. She learned that some individuals were planning on a protest and
        decided to make the trip to Cleveland, feeling compelled to make her voice heard.

48.     Goist arrived in downtown Cleveland, at the Justice Center, around 3:00 p.m. She
        joined about 20 other protesters who were demonstrating peacefully in front of the
        building. Around 4:30 p.m., Goist rode to Impett Park, on the west side of town, for a
        Tamir Rice demonstration.

49.     After an hour or two at Impett Park, about 100-200 individuals who had gathered
        there began to march back towards downtown Cleveland.  Goist marched with them
        back to the Justice Center, where she remained until approximately 8:30 p.m. At this
        time she decided to eat dinner with a friend on West 6th Street before heading home.

50.     However, as Goist and her companion were leaving dinner, now about 9:45 p.m., she
        noticed that a large group of protesters were making their way down West 6th Street
        and decided to join the group.  As the group made its way north on West 6th Street,
        she and the other protesters realized that two or three police had blocked off the
        street, forcing the group to turn left into Johnson Court.

51.     As the group entered the alley, a group of about 30 police officers, in full riot gear,
        suddenly came from behind them, and ran past them, down the alley. They then
        arranged themselves into a barrier consisting of at least two rows of officers holding
        shields and blocked the west entrance to the alley. A similar multi-row barricade of
        officers formed on the east side of the alley, where Goist and the group of protesters

had entered, completely trapping them inside Johnson Court.  There was no way they could exit.  *See* Video Clip 2 (Ex. 2); Sergeant Tucker Report, Pg. 2 (Ex. 3).

52. Though Goist could hear officers yelling "move back," she was unsure of how to comply with the order because there was nowhere for the protesters to move. She found it impossible to understand what the police meant by this ambiguous order – especially because they were shouting it from both sides.  Goist never heard any order to disperse.  Even if there had been one, she would not have been able to comply because the police were blocking the only exits.  She wanted to approach the line of officers to ask if she could leave, but she knew she would be arrested if she did because anyone who approached the line was grabbed and arrested.

53. Goist put up her hands in a plea not to get shot and asked, "Am I being detained?" She received no response.  The officers then broke their formations and began to run and physically force everyone onto the sidewalk.  One officer applied so much force to Goist's chest that it left a red mark that lasted until the following afternoon.

54. Goist heard an officer command over a megaphone that if protesters "didn't want to get arrested," they needed to "form a single-file line," and that if they complied they would be "free to go."  Accordingly, some protesters formed a line so that they could exit the alley.  After about ten to fifteen seconds, the officers came down the line and began to put "flexicuffs" tightly on Goist's and the protesters' wrists.

55. At around 11:00 p.m., Goist and the other arrestees were taken to Burke Lakefront Airport.

56. At approximately 1:00 a.m., now May 24, Goist and the other arrestees were taken from Burke to the city jail on West 3rd Street. Later in the day, Goist was only one of

four women who remained in the city jail; the other female arrestees were taken to the County Workhouse.

57.     On the afternoon of May 24 (Sunday), an officer informed Goist and the other protest inmates that they would not be released that day because there was a Cleveland Cavaliers basketball game.

58.     Later that day, another officer, on a different shift, also told the inmates that they would not be released that night because, "the Cavs are playing."

59.     Goist's ordeal was made all the more uncomfortable because, although she is a vegetarian, she was denied vegetarian meals.  During the entire period of her detainment, nearly 36 hours, her meals consisted of cereal or 4 to 5 lettuce scraps.

60.     Goist remained in the city jail until she was freed following a hearing on the morning of Monday, May 25, 2015.

61.     Following her arrest and imprisonment, Goist now fears protesting.  She describes the experience from May 23 to May 25 as "one of the scariest situations of my life."

62.     Before her arrest, she had planned to participate in future Black Lives Matter protests, but because of her arrest, she has chosen to remain silent out of fear that the police will repeat their actions.  She is unsure if she will ever protest again, despite her passion for social justice and strong interest in the City of Cleveland.

**Khalil Weathers - May 23-25**

63.     Weathers learned of the Brelo verdict in the afternoon hours on May 23. Around 5 p.m., he decided to join the protest and made his way to the Justice Center in downtown Cleveland. He looked for and found a group of protesters.

64.  Weathers marched peacefully with the group until, while walking north on East 4th Street, he heard noises that sounded like a confrontation between protesters and police. Weathers ran to Euclid Avenue and turned right, not wanting to be near this commotion.

65.  Gathering with other protesters on Euclid Avenue, Weathers and the group marched until they reached West 6th Street. After starting north on West 6th, Weathers realized that the police had blocked the road so that the protesters had to turn left into Johnson Court.  The police herded Weathers and the other protesters into Johnson Court.

66.  Once inside Johnson Court, Weathers realized that he was trapped, because both ends of the alley were blocked by the police.  Anyone who got too close to a line of police was arrested.  *See* Video Clip 2 (Ex. 2); Sergeant Tucker Report, Pg. 2 (Ex. 2).

67.  Weathers heard several protesters ask the officers why they couldn't leave, and if there was someone in charge they could talk to.  The police would not answer.

68.  After about ten minutes, Weathers heard the police say "let them go," so he joined a line of protesters that formed, hoping to leave through a small gap the police had created in their line.  However, just a moment later he heard another officer say "stop, don't let them pass," and as protesters tried to leave, the police began arresting them.

69.  The protestors and onlookers inside Johnson Court – approximately 70 individuals – were arrested.  Weathers was not given a reason for his arrest by officers.  The officers placed zip ties on Weathers' wrists so tight as to cause him pain and his hands to go numb.  Weathers' complaints were ignored.

70.  Weathers was later charged with "failure to disperse."  He had never heard any order to disperse.  In any event, there was no opportunity to disperse because the police had

completely surrounded him and the others, leaving no way to exit Johnson Court except with handcuffs.

71. Like the other arrestees, Weathers was taken to Burke Lakefront Airport around 11:00 p.m.  Weathers sat on the concrete floor in pain because the zip ties were left on.  Weathers saw a rat running across the floor.  His requests for water were ignored.

72. After several hours Weathers was transported from the hangar to the city jail on West 3rd Street.  Weathers was forced to spend two nights in custody.  He was held in the city jail for over 24 hours following his transfer in the early morning hours on May 24, 2015.

73. Weathers had planned to attend demonstrations on Sunday, May 24, 2015, but Defendants' holding him in jail prevented him from attending.

74. Weathers was not freed until a hearing on the morning of Monday, May 25, 2015.

75. Given his mistreatment by Defendants, Weathers now fears that he will again be arrested, detained, and charged despite doing nothing wrong except exercising his right to protest.  However, although he is worried about being mistreated again, Weathers plans to protest in the future because he feels strongly that it is the right thing to do.

**Jason Rodney - May 23-25**

76. Though Rodney currently lives in Minnesota, he was visiting his father in Cleveland when he learned of the Brelo verdict.  On the evening of May 23, around 7:30 p.m., Rodney decided to go to the Justice Center in downtown Cleveland to see what was happening.

14

77. Shortly after arriving at the Justice Center, Rodney joined with a group of protesters, eventually ending up at West 6th Street, and then inside Johnson Court.

78. Rodney noticed that police lines had formed, blocking both ends of the alley so that the protesters could not exit.

79. While trapped in the alley, Rodney was able to hear unclear sounds that seemed to be from a police speaker, but he could not make out what was being said. From what Rodney saw, those who moved forward to try to figure out what the police were saying, were being grabbed and arrested.

80. Rodney began to feel trapped and afraid, and shouted to the police several times asking if there was a way to get out of the alley. None of the officers would respond to his queries. He had no idea what the police wanted the protesters to do, or what the police planned to do with them. Rodney did not hear any order to disperse. Since lines of police officers equipped in riot gear blocked any potential exit, compliance with any such order would have been impossible anyhow. He was soon placed under arrest with others in the alley.

81. Like McNulty and the others, Rodney was taken to Burke Lakefront Airport around 11:00 p.m. He was forced to sit on the concrete floor of an empty hangar. Rodney sneezed from excessive dust, and saw a rodent run across the hangar floor. He later realized that he had about ten spider bites and a rash on his knee, possibly from sitting on the dirty floor, or possibly from the dirty jail cell where he was headed next.

82. After about an hour, Rodney was transported from the hangar to the city jail on West 3rd Street. Though the cells were designed for one inmate, two individuals were

placed in each cell. As a result, Rodney had to sleep with his head directly under the toilet.

83. Rodney spent Saturday night, all day Sunday, and Sunday night in jail. He was not freed until a hearing on the morning of Monday, May 25, 2015.

84. As a result of his treatment by the Defendants from May 23 to May 25, 2015, despite his lifelong passion for social justice, Rodney is afraid to attend protests in Cleveland, especially nighttime protests.  He fears getting corralled with no way to avoid getting arrested, through no fault on his part; he fears being held in jail for so long; and he fears the risk of having another arrest blemish his otherwise clean record.

**The Cleveland Police Department Admits its Policy of Corralling and Detaining Protestors to Keep them off the Streets**

85. Unknown to the protesters, Cleveland Municipal Court had been prepared to process the arrestees on Saturday, May 24.  Judges were available, and prosecutors and defense counsel were lined up, but the Division of Police did not bring protesters to court that day.  Instead, the police delayed until Memorial Day, May 25, to bring the arrestees to court.

86. On June 24, 2015, when Cleveland Deputy Chief of Police Dornat "Wayne" Drummond was asked why protesters charged with low-level misdemeanors were arrested instead of cited and immediately released, he explained, "I'll let the Law Department respond to your concerns, but from my perspective, it doesn't make much sense to cite and release the protestors and let them back out on the streets to protest again."  *See* Declaration of Jocelyn Rosnick, attached as Exhibit 5.

**The ACLU of Ohio – Future Protests**

87.   Defendants' heavy-handed, punitive response to the May 23 protests has had a large impact on local activists.  Many law-abiding citizens, including ACLU of Ohio members, are now understandably reluctant to attend or participate in lawful protests within the City of Cleveland.

88.   In light of the ACLU of Ohio's mission and in response to Defendants' actions, and the pressing harm to its membership, ACLU of Ohio has been forced to divert staff time and organizational resources to investigate and challenge the policy and practice of retaliatory arrests, and will be forced to continue to do so in the future.

89.   ACLU of Ohio members include a number of passionate activists who attend demonstrations to make their voices heard on issues that they care about.  For example, some members participate in protests criticizing practices or policies of the Cleveland police department.

90.   A number of ACLU of Ohio members had specific plans to attend protests at the Republican Candidate Debates to be held in Cleveland on August 6, 2015.  Among such members are Christine Link ("Link"), Jeff Miller ("Miller"), and Tim Cable ("Cable").

91.   As a result of the arrest and detention of the law-abiding Brelo protesters on May 23-25, Link, Miller, and Cable are now afraid to attend any demonstration in Cleveland for fear that, despite the fact that they would not break any laws, they would be retaliated against by the Cleveland police simply for attending a protest.

92.   Unless this Court intervenes to restrain Defendants from their policy of arresting individuals for their lawful protest activity and detaining protesters to keep them from

further protest, Link, Miller and Cable will not assemble to protest at the Republican

Candidate Debates on August 6.


## CAUSES OF ACTION

### COUNT ONE
### Constitutional and Civil Rights Pursuant to 42 U.S.C. § 1983
### Violation of First Amendment and Ohio Constitution
### Retaliation Based on Speech and Assembly
### (Against all Defendants)

93.     The foregoing allegations are incorporated as if re-alleged herein.

94.     Peaceful protesting and assembly are fundamental constitutional activities protected

by the First Amendment to the United States Constitution.

95.     Defendants' policy and actions of citing, arresting, and imprisoning Plaintiffs for two

full nights and nearly a day and a half, and charging them with crimes, were at least

partly – if not solely – motivated by Defendants' response to the individual Plaintiffs'

exercise of their First Amendment rights to protest and assemble peacefully.

96.     Defendants' policy and actions punished the individual Plaintiffs for engaging in their

constitutionally protected activities of peaceful protest and assembly.

97.     Defendants' policy and actions, not to "let them back on the streets," thus constitute

retaliation against the individual Plaintiffs for Plaintiffs' exercise of fundamental First

Amendment rights.

98.     Defendants' policy and actions would chill a person of ordinary firmness from

engaging in the constitutionally protected activities of peaceful protest and assembly.

99.     As a direct result of Defendants' unconstitutional policy and practice, and the

constitutional violations committed by Defendants, the individual Plaintiffs have

suffered serious personal injuries and are entitled to relief under the federal and state constitutions and 42 U.S.C. § 1983.

100.    Defendants' unconstitutional policy of retaliation against protesters has caused and will continue to cause irreparable harm to the rights of all of the Plaintiffs, and of the community at large, to engage in the constitutionally protected activities of peaceful protest and assembly.

<u>**COUNT TWO**</u>
<u>**Constitutional and Civil Rights Pursuant to 42 U.S.C. § 1983**</u>
<u>**Violation of First Amendment and Ohio Constitution**</u>
**Prior Restraint**
**(Against all Defendants)**

101.    The foregoing allegations are incorporated as if re-alleged herein.

102.    Defendants arrested the individual Plaintiffs and kept the individual Plaintiffs detained for the purpose of preventing them from protesting on Sunday, May 24.

103.    This unconstitutional policy and practice of Defendants prevented the Plaintiffs and other protesters from expressing their views publicly. This policy and practice of Defendants imposed a prior restraint on the individual Plaintiffs' speech, in violation of the individual Plaintiffs' Constitutional rights.

104.    As a direct result of these constitutional violations committed by Defendants, the individual Plaintiffs have suffered and continue to suffer serious personal injuries and are entitled to relief under the federal and state constitutions and 42 U.S.C. § 1983.

105.    Defendants' unconstitutional policy of prior restraint of speech poses irreparable injury to the rights of all of the Plaintiffs, and of the community at large, to engage in the constitutionally protected activities of peaceful protest and assembly.

**COUNT THREE**
**Constitutional and Civil Rights Pursuant to 42 U.S.C. § 1983**
**Violation of Fourth Amendment Right to be Free of Unlawful Seizure:**
**Seizure by Restricting Plaintiffs' Movement in Johnson Court Without**
**Reasonable Suspicion**
**(Against all Defendants)**

106.     The foregoing allegations are incorporated as if re-alleged herein.

107.     Defendants, acting through their agents in the police department, caused the

individual Plaintiffs to be trapped in Johnson Court by herding them into a confined

space and blocking all available exits.

108.     The Fourth Amendment requires that restrictions on movement and liberty be

carefully justified by objective facts showing reasonable suspicion or probable cause

to believe that the individual had committed a crime.

109.     When they herded the protesters into Johnson Court, officers had no reasonable

suspicion or probable cause to believe that the individual Plaintiffs or the protesters or

any particular protester in the group had violated any law.

110.     By restricting the protesters movement into Johnson Court without reasonable

suspicion or probable cause, Defendants subjected the individual Plaintiffs to an

unreasonable seizure in violation of the Fourth Amendment.

111.     As a direct result of these constitutional violations committed by Defendants, the

individual Plaintiffs have suffered and continue to suffer serious personal injuries,

and are entitled to relief under the federal constitution and 42 U.S.C. § 1983.

**COUNT FOUR**
**Constitutional and Civil Rights Pursuant to 42 U.S.C. § 1983**
**Violation of Fourth Amendment Rights**
**Unlawful Seizure ByArresting Occupants of Johnson Court Without Probable**
**Cause**
**(Against all Defendants)**

112.    The foregoing allegations are incorporated as if re-alleged herein.

113.    The individual Plaintiffs were charged under Cleveland's "failure to disperse" ordinance, which states that, "No person shall *knowingly* fail to obey such order." (emphasis added) Cleveland, Ohio Municipal Code § 605.02.

114.    However, the individual Plaintiffs did not hear an order, assuming in fact that any such order was given.  If an order was given, it was not reasonably calculated to be heard by the protesters.

115.    Without knowledge of such an order, the individual Plaintiffs could not have "knowingly" failed to obey the order.  The City's officers were made aware of this by the numerous requests for clarification made by the protesters.

116.    Alternatively, even assuming arguendo an order had been given, and the individual Plaintiffs heard the order, compliance was made impossible since police were blocking the only exits from Johnson Court.

117.    Because the individual Plaintiffs were unaware of any order to disperse—again, assuming such order was given—and because compliance with any order was rendered impossible by the Cleveland police department, the individual Plaintiffs' arrests and subsequent imprisonment for "failure to disperse" were without probable cause.

118.    By arresting and imprisoning the individual Plaintiffs without probable cause, Defendants violated Plaintiffs' Fourth Amendment right to be free from unreasonable seizures.

119.    As a direct result of these constitutional violations committed by Defendants, the individual Plaintiffs have suffered and continue to suffer serious personal injuries and are entitled to relief under the federal constitution and 42 U.S.C. § 1983.

**COUNT FIVE**
**Constitutional and Civil Rights Pursuant to 42 U.S.C. § 1983**
**Violation of Fourth Amendment Rights**
**Unlawful Seizure – Extended Detention**
**(Against all Defendants)**

120.    The foregoing allegations are incorporated as if re-alleged herein.

121.    The individual Plaintiffs were charged under Cleveland's "failure to disperse" ordinance, § 605.02, which is a misdemeanor.

122.    The courts, prosecutors, and public defenders were all ready and available to process the protesters on Sunday, May 24.  However, Defendants caused the protesters to not be brought before the available judges or released from custody.  The delay was unnecessary, and motivated to interfere with and retaliate against the exercise of constitutional rights.

123.    Defendants' policy and practice of holding protesters in custody for longer than necessary, and increasing the length of custody for an improper motive, violated the individual Plaintiffs' Fourth Amendment right to be free from an unreasonable seizure.

124.    As a direct result of these constitutional violations committed by Defendants, the individual Plaintiffs have suffered and continue to suffer serious personal injuries and are entitled to relief under the federal constitution and 42 U.S.C. § 1983.

125.    Defendants' unconstitutional policy of holding protesters in custody for the improper motive of  keeping them from protesting threatens the rights of all of the Plaintiffs,

and of the community at large, to engage in the constitutionally protected activities of peaceful protest and assembly without facing unnecessarily long detentions.

## PRAYER FOR RELIEF

Plaintiffs, the ACLU of Ohio, Stephen McNulty, Robin Goist, Khalil Weathers, and Jason Rodney request that this Court enter judgment against Defendants City of Cleveland, Jackson, and Williams providing the following relief:

A.  Damages in whatever amount the individual Plaintiffs are found to be entitled;

B.  Injunctive Relief and Declaratory Relief;

C.  An award of interest, costs, and reasonable attorney's fees; and

D.  Such other and further relief as the Court deems appropriate.

Respectfully Submitted,

s/ Freda J. Levenson
Freda J. Levenson (0045916)
Trial Attorney for Plaintiffs
Drew S. Dennis (0089752)
Joseph Mead (0091903)
ACLU of Ohio Foundation, Inc.
4506 Chester Avenue
Cleveland, Ohio 44103
Tel: (216) 472-2220
Fax: (216) 472-2210
flevenson@acluohio.org
ddennis@acluohio.org
j.mead@csuohio.edu

*Attorneys for Plaintiffs*

23